**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**UNITED STATES OF AMERICA** *ex rel*                                    **PLAINTIFF**
**KELLY NICOLE HORTON**
**WUESTENHOEFER; and KELLY**
**NICOLE HORTON WUESTENHOEFER,**
**individually**

**V.**                                                              **NO. 4:10-CV-00012-DMB-DAS**

**A.J. JEFFERSON, et al.**                                                **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This False Claims Act and unlawful retaliation action is brought by Kelly Nicole Wuestenhoefer ("Relator") on behalf of herself and the United States. Doc. #29. Relator alleges that her former employer, Defendant South Delta Regional Housing Authority ("SDRHA"); Ann Jefferson, SDRHA's former Executive Director; and various other persons and entities, engaged in "wrongful, fraudulent and illegal conduct" with regard to funds of the United States Department of Housing and Urban Development ("HUD"). *Id.* at 12. Relator further alleges that SDRHA and its employees retaliated against her for her role in uncovering the fraudulent conduct. Finally, Relator alleges that SDRHA's accountant, Lloyd and Associates, LLC, and its owner, Michael Lloyd (collectively, "Lloyd") wrongfully aided the fraudulent conduct.

Before the Court are a number of pending motions: (1) Lloyd's motion for summary judgment, Doc. #206; (2) Lloyd's motion for attorney fees, Doc. #208; (3) SDRHA's motion for summary judgment, Doc. #245; (4) a motion for summary judgment by Defendant Patricia Logan, Doc. #247; (5) a motion for summary judgment by Defendant Dinnial Love, Doc. #249; (6) a motion for summary judgment by Defendant Howard Sanders, Doc. #251; (7) a motion for

summary judgment by Defendant Larry Cordell, Doc. #253; (8) a motion for summary judgment by Defendant Robert Gray, Doc. #255; and (9) Lloyd's motion to strike, Doc. #244.

## I
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court

"resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A.  HUD's Funding Regulations

The HUD Housing Choice Voucher ("HCV") program "pays rental subsidies so eligible families can afford decent, safe and sanitary housing."  24 C.F.R. § 982.1(a).  HCV programs "are generally administered by State or local governmental entities called public housing agencies (PHAs)."  *Id.*  HUD provides PHAs with the housing assistance funds necessary to run the HCV program ("Housing Assistance Payments" or "HAPs") and with "funds for PHA administration of the programs."  *Id.*; Doc. #206-1 at 7.

HAP funding "may only be used for eligible HAP needs of rent, family self-sufficient escrow payments or utility reimbursements [and] shall not under any circumstances be used for any other purpose, such as to cover administrative expenses …."  Doc. #245-9 at 4 (emphases omitted).  In instances where a housing authority "is found to have misappropriated HAP funds by using the funds for any purpose other than valid HAP expenses … HUD will require the immediate return of the funds of the HAP."  *Id.*

 "[A]dministrative fees may only be used to cover costs incurred to perform … administrative responsibilities for the [HCV] program in accordance with HUD regulations and requirements."  24 C.F.R. § 982.152(a)(3).  If excess administrative funds ("administrative fee reserves") exist at the end of a fiscal year, "the PHA may use these funds for other housing purposes permitted by State and local law.  However, HUD may prohibit use of the funds for certain purposes."  24 C.F.R. § 982.155.  Since 2004, HUD has restricted the use of

administrative fee reserves "to activities related to the provision of rental assistance under the [HCV]." Doc. #244-3 at 3.

PHAs must "maintain an administrative fee reserve [for the HCV] program …. The PHA must credit to the administrative fee reserve the total of [t]he amount by which program administrative fees paid by HUD for a PHA fiscal year exceed the PHA program administrative expenses for the fiscal year [plus i]nterest earned on the administrative fee reserve." 24 C.F.R. § 982.155. Furthermore, a PHA "must engage and pay an independent public accountant to conduct audits in accordance with HUD requirements." 24 C.F.R. § 982.159(a).

HUD requires reports on "Financial Operations and Accounting" for two primary purposes: (1) "to determine if funds expended during the period were used for the program activities authorized by HUD in accordance with approved budgets and program regulations;" and (2) "to monitor HA performance …." Doc. #245-5 at §§ II-1, II-2.

### B. SDRHA

SDRHA is a Mississippi public corporation organized "to provide affordable housing to qualified individuals in" Bolivar, Humphreys, Sunflower, Issaquena, Sharkey, and Washington Counties. Doc. #206-1 at 1. The County Commissioner from each of the six counties serviced by SDRHA appoints an individual to sit on SDRHA's Board of Commissioners ("the Board"). *Id*. The six appointed commissioners elect a seventh person to serve on the Board. *Id*. The Board shoulders the responsibility of "oversee[ing] federal funds." Doc. #311 at 12. Although the Board governs SDRHA, an Executive Director hired by the Board administers the corporation's day-to-day operations. Doc. #206-1 at 1.

During the time period relevant to this suit, SDRHA operated: (1) a Housing Choice Vouchers program run by HUD; (2) a Section 8 New Construction ("NC") & Substantial

Rehabilitation program run by HUD; (3) SDRHA Owned Rental Housing; and (4) a SDRHA-run "Homeownership" program. Doc. #206-1 at 2. Simultaneously, SDRHA maintained five separate bank accounts: (1) "Section 8 New Construction/Sub Rehab ("NC Account"); (2) "Housing Choice Voucher" ("HCV Account"); (3) "Business Activities" ("Business Account"); (4) "Component Unit/other" ("Component Account"); and (5) "Disaster Voucher Program" ("DV Account"). *Id*. at 7. The Business Account operated as SDRHA's "primary authority-wide operating account."[1] *Id*.

SDRHA obtained funding from HUD by submitting information to HUD through the Voucher Management System ("VMS"). Doc. #245-2 at ¶ 5. VMS submissions were submitted monthly. *Id*. Based upon the information contained in the VMS submissions, HUD would deposit three types of funds into the NC Account: (1) NC HAP funds; (2) HCV HAP funds; and (3) administrative funds. *See* Doc. #206-1 at 8; Doc. #245-2 at ¶ 6. During the time period relevant to this suit, "HUD would base their housing assistance payments … on the previous year's expenditures. So whatever they would receive in 2008 would be based on what they spent in 2007 with an inflation factor." Doc. #206-2 at 20. The administrative fees, in turn, were "based on the number of units leased on the first day of each calendar month." *Id*.

Under then-SDRHA procedures, the HCV HAP funds were transferred to the HCV account; the administrative funds were transferred to the Business Account; and the NC HAP funds remained in the NC Account. Doc. #206-1 at 8. If the administrative funds exceeded the allocable expenses for the NC or HCV programs, then SDRHA created a "payable (due to)" entry for the corresponding program. *Id*.

---

[1] According to 1996 HUD guidance, "the ACC permits an HA to pool funds from various sources to promote efficiency and to facilitate program operations." Doc. #245-5 at § II-14.

Pursuant to SDRHA and HUD's Consolidated Annual Contributions Contract ("ACC"), SDRHA was required to use the funds in compliance "with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements." Doc. #245-3 at 3. The ACC provided that "[i]f the [housing authority] is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may … [d]irect the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses." Doc. #245-3 at 3. Furthermore,

> [u]pon written notice to the HA, HUD may take possession of all or any HA property, rights, or interests, in connection with a program, including funds held by a depository, program receipts, and rights or interests under a contract for housing assistance payments with an owner, if HUD determines that … [t]he HA has failed to comply with any obligations under this consolidated ACC …

*Id*. at 3–4.

### C. Ann Jefferson's Tenure as Executive Director

In September 2006, Ann Jefferson was hired as SDRHA's Executive Director. Doc. #225 at ¶ 1. At that time, Relator was employed as SDRHA's Property Manager and Broker and Accounts Receivable Analyst. *Id*.

After Jefferson was hired, "she and others in management … did everything toward the running of the housing authority." Doc. #311 at 17. Although the Board maintained its responsibility to oversee federal funds, it "had very little to do with the daily activities of the authority." *Id*. at 12–13. The Board held quarterly meetings, at which it would "look at different [financial] things." *Id*. at 11. However, Larry Cordell, a Board member, admitted that this review was largely cursory, and that the Board members acted as Jefferson's "rubber stamp" on matters of spending. *Id*. at 38–39.

"Almost immediately" after her hire, Jefferson terminated SDRHA's relationship with its previous accountants – Jason Casterline and Baird and Stallings CPA's P.A. Doc. #225 at ¶ 2. In their place, Jefferson hired Charles Buchanan to serve as SDRHA's auditor and Lloyd to serve as SDRHA's fee accountant. *Id.* Both Buchanan and Lloyd worked with Jefferson when she was employed at a housing authority in St. Louis. *Id.*

As the auditor, Buchanan had the "responsibility to make an opinion regarding … the accuracy of the financial statements." Doc. #206-2 at 55. In making this opinion, the auditor is required to have "actually reviewed documents, checks and the compliance issues that an auditor must abide by under the purview of being a [certified public accountant]." *Id.* Lloyd, as the fee accountant, performed a review "lesser than the level of review of an audit." *Id.* The position of fee accountant did not carry a "duty to find fraud." *Id.* at 60.

In June 2007, Jefferson fired Darlene Mauceli and Melanie Herbert, "long-term employees of SDRHA [who] constituted the entire financial Department of SDRHA." Doc. #225 at ¶ 3. A few months later, in the fall of 2007, Jefferson "convinced the Board of Commissioners to … increase her … check-writing authority from $10,000.00 to $200,000.00." *Id.* at ¶ 6.

In May 2009, Jefferson raised the rental rates for homes in SDRHA's rental program. *Id.* at ¶ 8. On July 22, 2009, the residents of SDRHA filed an action in this Court seeking to enjoin the rate hike. *See Lowe v. South Delta Regional Hous. Auth.*, 4:09-cv-73 (N.D. Miss. Jul. 22, 2009) ("*Lowe*"), at Doc. #1; Doc. #225 at ¶ 9. On August 21, 2009, U.S. District Judge Allen Pepper convened an injunction hearing at which Jefferson testified.[2] *Lowe*, at Doc. #28.

---

[2] The case subsequently settled. *See Lowe*, at Doc. #138.

"Several weeks" after the *Lowe* injunction hearing, Relator received a copy of the hearing transcript. Doc. #225 at ¶ 10. Upon reviewing the transcript, Relator came to the conclusion that "Jefferson had committed perjury." *Id.* Relator contacted Paul Mathis, SDRHA's former attorney, and informed him that Jefferson committed perjury during the SDRHA proceeding. *Id.* at ¶ 11. Mathis, in turn, informed Judge Pepper of the alleged perjury. *Id.*

### D. SDRHA Accounting Methods

As explained above, SDRHA's Business Account contained funds for the operations of its HUD and non-HUD programs. To the extent the funds for one of the HUD programs exceeded the operating expenses, SDRHA created a "due to" record for the relevant HUD account.

Lloyd provided monthly statements to SDRHA reflecting the account balances for the year. Doc. #245-4 at 46. Additionally, at the end of each fiscal year, Lloyd submitted to HUD, through HUD's Real Estate Assessment Center, a "balance sheet and income statement for the entire year of operations, broken down by non-HUD … business activities[,] … the housing choice voucher program, the new construction program [and] any other activities that may be going on with South Delta for that particular year." *Id.* at 46–47, 64–65.

Buchanan performed annual audits of SDRHA's financials. *See* Doc. #245-7. It is undisputed that the annual audits were transmitted to HUD.

In the course of preparing the "due from/due to" monthly balances, Lloyd became aware that Jefferson regularly moved to the Business Account "much more" HUD administrative fees than were necessary for the operation of the programs. Doc. #245-4 at 71–72. Lloyd told Jefferson that the wholesale transfer of administrative funds "is not a practice that we typically follow in housing authorities, that you should look at our monthly reports and transfer the

balance that is owed and not the whole administrative fees." *Id*. Lloyd testified that this "was her typical management decision to do that the whole time." *Id*. at 73.

Lloyd also disagreed with Jefferson on SDRHA's obligations following administrative fee transfers. *Id*. at 73–74. At various points Jefferson told Lloyd that the Business Account "never" owed the HUD accounts money. *Id*. Lloyd responded that SDRHA's non-HUD accounts did, in fact, owe the HUD accounts money. *Id*. at 74–76. Additionally, Lloyd informed Jefferson and Buchanan that it was "not a common practice to write off an inter-fund balance" and that the "proper" thing to do would be to pay off the balances. *Id*. at 83. While Lloyd reported the "inter-fund balances" to HUD, he never informed the Board of Jefferson's stance on the re-payment of HUD funds. *Id*. at 74, 83.

Unlike Lloyd, Buchanan followed Jefferson's mandate regarding the treatment of HUD funds. *See* Doc. #206-1 at 7–9. Sometime in 2008, Buchanan prepared an audit "for the period October 1, 2006 through December 31, 2007" ("FY 2007 Audit"). Doc. #245-7. In the FY 2007 Audit, Buchanan included a notation that:

> GASB 34 standards require that year-end interfund receivable and payable balances be eliminated from the Statement of Net Assets.
>
> Interfund receivables/payables of $373,419 at December 31, 2007, were eliminated.

*Id*.

The audit for the fiscal year ending December 31, 2008 ("FY 2008 Audit") did not reflect any debt between the Business Account and the HUD accounts. Doc. #245-7. However, relevant Financial Data Schedule ("FDS") submissions showed that the Business Account owed

$344,076 to the HCV Account. Doc. #206-1 at 8. In 2009, the amount owed to the HCV Account was "written off"[3] by Buchanan and Jefferson. Doc. #206-1 at 8.

The audit for fiscal year 2009 ("FY 2009 Audit") reflected that the Business Account owed the HCV Account $174,812. Doc. #245-7. In 2010, this amount was written-off by Jefferson and Buchanan. Doc. #206-1 at 8.

The audit for fiscal year 2010 ("FY 2010 Audit") reflected that: (1) the Business Account was owed $1,871; (2) the HCV Account was owed $20,416; and (3) the NC Account owed $24,8111. Doc. #206-8 at 15.

The audit for fiscal year 2011 ("FY 2011 Audit"), which was prepared by Bell & Associates, CPA, of Chicago, Illinois, reflected that: (1) the Business Account owed $68,436; (2) the HCV Account was owed $83,848; and (3) the NC Account owed $15,412. Doc. #206-9 at 15.

Although the FY 2008–2011 Audits did not specifically reference write offs, all the documents contained the following notation:

**Interfund Transactions**
Quasi-external transactions are accounted for as revenue, expenditures or expenses. Transactions that constitute reimbursements to a fund for expenditures/expenses initially made from it that are properly applicable to another fund, are recorded as expenditures/expenses in the reimbursing fund and as reductions or expenditures/expenses in the fund that is reimbursed. These transactions are referred to as Transfer in or Transfer outs. Other quasi-external transactions are accounted for as receivables or payables when they are to be repaid to the paying program. All such transactions are eliminated in the Government-wide statement of Net Assets and Statement of Activities-Proprietary funds.

---

[3] Lloyd described the act of writing off a debt as: "[t]he auditor makes an adjustment … on the non-HUD books and on the housing choice voucher books to write off that amount." Doc. #245-4 at 81. While the debt is eliminated for the purpose of the audit, it is "still maintained in the financial records of South Delta Housing Authority in the general ledger system …. Anybody who wanted to look and see what happened to the inter-fund balances could look at the detail and see what happened." *Id.* at 82. Lloyd objected to the write-offs because it was "not a common practice to write off an inter-fund balance." *Id.* at 83. However, because he had already reported the accurate inter-fund balances to HUD, Lloyd did not tell anyone about the write-offs. *Id.*

*See* Doc. #245-7 (emphasis in original).

**E.  Limited Financial Assessment**

On November 15, 2011, HUD issued a Limited Financial Assessment ("LFA") regarding SDRHA's finances.  Doc. #206-1. The audit identified Lloyd as "the fee accountant," and Buchanan as "the auditor."[4]  *Id*. at 3.

> With regard to the FY 2008 Audit, the LFA concluded:
>
> The FY 2008 annual report submitted to HUD did not show any balances in the inter-program due from or due to accounts.  However … the accounting records showed that SDRHA had significant balances in the inter-program accounts.  SDRHA management stated that because of guidance received from HUD, they incorrectly eliminated the inter-program accounts from the FY 2008 financial reports.  The HCV program had a net receivable of $344,076 that was due from the Business Activities (Non-HUD) program.  The balance appears to have occurred because HCV administrative fees that were transferred to the Business Activities … account exceed the HCV related expenses paid out of the Business Activities … account ….  Even though the Business Activities had sufficient resources to repay the loan, during 2009 SDRHA wrote-off the $344,076 that the Business Activities … account owed to the HCV program.  The [Executive Director] discussed the balances with the fee accountant because she did not think the balances were correct.  A decision was made to write-off the balances.  The write-off effectively resulted in an unallowable use of federal funds.

Doc. #206-1 at 8.

As to the FY 2009 Audit, the LFA concluded that at the end of FY 2009, "$174,812 was due from the Business Activities … program [to the HCV Account] and $50,059 was due from the New Construction program [to the HCV Account]."  Doc. #206-1 at 8.   The LFA further noted that, notwithstanding the fact that both the New Construction and Business Accounts had sufficient funds to cover their balances, "a decision was made to write-off the 2009 balances."

---

[4] Notably, the LFA stated that Buchanan was "debarred" for failing "to make working papers from audits of PHA's available for a quality control review by HUD."  Doc. #206-1 at 3.  While the debarment was effective November 20, 2009, he was allowed to perform SDRHA's FY 2010 Audit.  *Id.*

*Id*. As with the FY 2008 write-off, the LFA concluded that "[t]he write-off effectively resulted in an unallowable use of federal funds." *Id*.

With regard to FY 2007, the LFA noted that the New Construction Account owed the HCV account $145,727, and that the New Construction Account had sufficient funds to pay off the debt. *Id*. With regard to FY 2010, the LFA noted that the New Construction Account owed the HCV account $20,416, and that the New Construction Account had sufficient funds to pay off the debt. *Id*. at 9. However, the LFA did not state that either the FY 2007 or FY 2010 debt was eliminated or that SDRHA's activities with respect to these amounts resulted in an unallowable use of federal funds.

### F. Investigation and Jefferson's Response

On January 27, 2010, Relator contacted John Alexander of the United States Attorney's Office for the Northern District of Mississippi regarding her suspicions regarding Jefferson. Doc. #225 at ¶ 10. Alexander referred Relator to the Federal Bureau of Investigation ("FBI"). On February 5, 2010, Relator met with FBI Special Agent Steve Thomason and informed him "of the general nature of the information that [she] had regarding … Jefferson." *Id*. at ¶ 12. Three days later, Relator repeated this information to Agent Thomason and HUD Office of Inspector General ("HUD OIG") Special Agent Angela Pryor. *Id*. at ¶ 13. Agents for HUD and the FBI testified that Relator was the person responsible for bringing Jefferson's activities to the government's attention. Doc. #226 at ¶ 3; Doc. #227 at ¶ 4.

On February 10, 2010, Relator provided a container of documents to Agents Pryor and Thomason. Doc. #225 at ¶ 14. Included in the documentation was at least one invoice which Relator "strongly suspected was false." *Id*. Relator told the agents that she suspected Jefferson

12

and Jimmy Johnson, a SDRHA contractor, "were working together to embezzle money from HUD … and to provide kickbacks to … Jefferson." *Id*.

About two years later, on February 12, 2012, Relator, appearing pro se,[5] filed this action under seal. Doc. #1. The original complaint, which was filed against Jefferson, SDRHA, the SDRHA Board, and various Board members, charged numerous violations of state and federal law. *Id*. Although the claims varied, the crux of the complaint was that Jefferson was engaged in a conspiracy to embezzle funds and that the Board acted with "indifference" to Jefferson's conduct. Doc. #1 at ¶ 20–24. While the complaint did not specifically name Lloyd or Buchanan as defendants, it alleged that:

> Jefferson, with specific design, on or about January 2007, terminated South Delta's existing accountants and contracts, she considered essential to her conspiracy and then hired and retained out of state accountants and other contractors, she can control and who Plaintiff verily believes have assisted her in what the Plaintiff believes, is a criminal enterprise that assists Jefferson in covering up and otherwise, concealing the reporting of her true financial dealings and other activities, as the executive director, with respect to the disposition of South Delta's State and Federal funds.

Doc. #1 at ¶ 21.

Two weeks later, on February 26, 2010, Relator found in the SDRHA offices "blank invoices" for Johnson Brothers' Construction.[6] Doc. # 225 at ¶ 17. Relator provided these invoices to Agent Pryor. *Id*. On April 16, 2010, Relator agreed to act as a confidential informant for the FBI in connection with its investigation of Jefferson. *Id*. at ¶ 19.

In support of her investigation, Agent Pryor subpoenaed bank records of SDRHA and forwarded them to Kathy Howell, a HUD OIG research specialist. Doc. #227 at ¶ 8. Based on

---

[5] Although the complaint represents that Relator was appearing pro se, she later admitted that Mathis "assisted … in the preparation of the complaint." Doc. #225 at ¶ 15.

[6] FBI Special Agent Dustin Blount offered an affidavit stating that the disclosure of these invoices was independent of any publicly disclosed information and "materially added" to the investigation. Doc. #226 at ¶ 14. Blount explained that the invoices "were filled out by Jefferson, or others at her behest, to fraudulently obtain payment of monies from accounts into which federal funds had been comingled." *Id*.

the information she developed during her investigation, Pryor convened a meeting with HUD officials. Doc. #334-1 at ¶ 5. At the meeting, "as a direct result of [Pryor's] investigation," HUD elected to undertake the Limited Financial Assessment of SDRHA. *Id.*

On June 1, 2010, Relator met with FBI agents to prepare for the execution of a search warrant on SDRHA premises. Doc. #226 at ¶ 12. To this end, Relator provided the FBI "with a detailed blueprint of the building, including the location of each individual in the office and the job titles of each." *Id.*

On June 2, 2010, the FBI raided SDRHA. *Id.* at ¶ 13. Through this raid, the FBI "obtained additional documentation and bank records that assisted … in the investigation. The bank records that we[re] obtained in the raid were forwarded to Kathy Howell with HUD OIG to use in her analysis." *Id.*

On June 21, 2010, Assistant United States Attorney Robert H. Norman sent a letter to John T. Kitchens, who was then acting as Jefferson's attorney. Doc. #245-17. In relevant part, the letter stated:

> I understand from Special Agent Justin Newsome that you represent Ann Jefferson, who as you know is under federal investigation for mishandling and misappropriating South Delta Regional Housing Authority funds.
>
> I am writing to you to confirm Ann Jefferson's suspicions that Kelly Wuestenhofer is cooperating with the Federal Bureau of Investigation and has provided information relating to the commission of federal offenses.
>
> We learned from other cooperating sources that Ann Jefferson was convinced that Mrs. Wuestenhoefer was in fact a federal witness and was preparing to terminate Mrs. Wuestenhoefer's employment for that reason ….

*Id.*

In June, July, August, and "early" September of 2010, "Jefferson … began removing job responsibilities and duties from [Relator] and efforts were made to make work extremely

14

uncomfortable for her in hopes that she would quit." Doc. #295 at 2–3. More specifically, Jefferson "began to assign to [Relator] tasks that either could not be … accomplished, or if [Relator] did accomplish them, [Jefferson] claimed that Relator hadn't." Doc. #294 at 2–3. Jefferson also barred Relator from entering the accounts receivable room in SDRHA. Doc. #245-18 at 91. Additionally, Jefferson demoted Relator. Doc. #294 at 2.

On September 13, 2010, the FBI raided Jefferson's home. Doc. #294 at 3.

**G. Relator's Suspension and Termination**

Following the raid on SDRHA, the Board developed "a concern about the morale of the employees … in the agency." Doc. #245-18 at 85–86. In response to this concern, the Board conducted a hearing during which they questioned numerous SDRHA employees, including Angela Brady, Relator, Dinnial Love,[7] Pat Logan, and Mattie Minor. *Id*. at 145–46. According to Brady, she, Logan, Love, and Minor were instructed by Jefferson "on what we should say to the board and counsel so as to get [Relator] fired." Doc. #295 at 3. Specifically, Jefferson told the employees "to tell the board … that [Relator] was harassing us and threatening us with retaliation by the FBI , … that we were not comfortable working with her [and] that she was not doing her job." *Id*.

At the hearing, Brady testified that Relator had been "openly defiant" to Jefferson. Doc. #245-18 at 148. However, Brady told the Board that Jefferson instructed her, Love, and Logan to lie about Relator. Doc. #295 at 3–4.

On September 23, 2010, citing the "best interest of SDRHA," the Board voted to place Relator on administrative leave, with pay. Doc. #245-19. In its letter informing Relator of the suspension, the Board wrote:

---

[7] Defendant Dinnial Love is the maintenance supervisor for SDRHA. Doc. #249-1 at ¶ 2.

15

It has been alleged that on several occasions you have been advised and reminded to p[er]form your assigned duties as an employee according to your job description, including to refrain from the refusal to carry out direct orders which has and is causing confusion among the staff of SDRHA.

It has further been alleged that you have harassed and intimidated certain employees with threats of arrest. Most recently, we are advised that you have failed and refused to perform certain necessary inspections required to make sales of certain parcels of real property on the basis that you are physically unable to drive. You have been requested on an earlier date to provide a statement from a licensed physician verifying your alleged disability. Rather you produced a statement from a Nurse Practitioner on September 08, 2010 which is unacceptable to us. Your response to our request was that you did not feel our request for a statement from a licensed physician was necessary.

Doc. #245-19.

Following Relator's suspension, the Board received a letter from Mellanie Gentry, a tenant at SDRHA. Doc. #245-21. The letter stated that, following a meeting with Jefferson regarding a missing rent check, Gentry received a call from Relator, who stated that "she did not work in that office at this time, because she was the one who turned Mrs. Jefferies [sic] in to the [FBI] and they removed her from the office." *Id.* Relator also told Gentry that she had placed her rent check in a folder at SDRHA. *Id.*

On October 28, 2010, once again citing "the best interest of SDRHA," the Board voted to terminate Relator. Doc. #245-22. In its termination letter to Relator, the Board stated:

When you were placed on administrative leave with pay pending our investigation you were advised to refrain from interfering with the business of SDRHA.

The reason of termination is because we have been advised and believe that you have discussed SDRHA business with clients of SDRHA, without the authority [sic] which has interfered with SDRHA business.

Doc. #245-23.

### H. Criminal Action

On February 17, 2012, the United States of America filed an amended superseding indictment against Ann Jefferson and Jimmy Johnson. *U.S. v. Jefferson*, No. 4:11-cr-111 (N.D. Miss. Feb. 17, 2012) ("*Criminal Case*"), at Doc. #47-1. Of relevance here, the indictment charged that Jefferson, in her role as Executive Director for the South Delta Regional Housing Authority: (1) violated 18 U.S.C. § 641 by "willfully and knowingly" aiding and abetting Johnson in embezzling and converting approximately $10,000 of United States property when she awarded Johnson a contract for construction that had already been completed and then caused SDRHA checks to be written to Johnson for payment on the contract ("Count One"); (2) violated 18 U.S.C. § 641 when she billed personal expenditures to an SDRHA account which she knew "included co-mingled federal funds" ("Count Four"); and (3) violated 18 U.S.C. § 1513(e) when she retaliated against Relator for Relator's assistance in the FBI investigation regarding Jefferson's conduct ("Count Seven").

Following a four-day trial, Jefferson was convicted on multiple counts of the superseding indictment, including Counts One, Four, and Seven. *Criminal Case* at Doc. #54. On May 1, 2014, the Fifth Circuit Court of Appeals affirmed Jefferson's convictions. *U.S. v. Jefferson*, 751 F.3d 314 (5th Cir. 2014). In upholding Jefferson's convictions under Counts One and Four, the Fifth Circuit held that:

> the evidence presented against Jefferson at trial was overwhelming. Johnson, Jefferson's co-defendant testified that they embezzled government funds by creating a fraudulent $10,000 contract for work that had already been completed. [Angela] Brady corroborated Johnson's testimony – she helped Johnson cash a check written on the contract at a pawn shop and returned the funds to Jefferson. Testimony and exhibits at trial established that SDRHA repeatedly, at Jefferson's direction, paid for renovations at her Huddleston properly, many of which were incorrectly invoiced to other properties. The receipts and requisition orders for a number of these renovations bore Jefferson's signature.

17

*Id*. at 321.

## I. Amended Complaint in This Action

On August 1, 2012, Relator filed her first amended complaint against: (1) A.J. Jefferson in her individual and official capacity as Executive Director for SDRHA; (2) Chaka Williams; (3) Dinnial Love; (4) Patricia Logan;[8] (4) SDRHA; (5) the SDRHA Board; (6) Raymond Brown, "in his individual capacity and representative capacity as a Board Member of the SDRHA Board;" (7) Larry Cordell,[9] "in his individual capacity and representative capacity as a Board Member of the SDRHA Board;" (8) Robert Gray,[10] "in his individual capacity and representative capacity as a Board Member of the SDRHA Board;" (9) Howard Sanders,[11] "in his individual capacity and representative capacity as a Board Member of the SDRHA Board;" (10) Angelic Mister; (11) Michael Lloyd; (12) Lloyd and Associates, LLC; (13) Charles Buchanan; and (14) certain fictitious defendants. Doc. #29. In her amended complaint, Relator asserts claims for "Violation of the False Claims Act, "False Claims Act Conspiracy" and "Unlawful Retaliation in Violation of § 31 U.S.C. § 3730(h). Doc. #29 at 39–40.

Since the filing of the amended complaint, the parties have stipulated to the dismissal of the following claims: (1) the individual and official capacity claims against Brown; (2) the individual capacity claims against Mister; (3) the claims against the Board; and (4) the official capacity claims against Cordell, Gray, and Sanders. Doc. #222; Doc. #337. Additionally, on April 18, 2013, on Relator's motion, Patricia Logan in her official capacity as Executive Director

---

[8] Defendant Patricia Logan has served as Executive Director of SDRHA since February 2013. Doc. #245-2 at ¶ 2.

[9] Defendant Larry Cordell was a member of the SDRHA Board during the time period relevant to this suit. Doc. #253-1 at ¶ 5.

[10] Defendant Robert Gray is a member of the SDRHA Board. Doc. #255-1 at ¶ 2. He served on the Board during the time period relevant to this suit. *Id*. at ¶ 5.

[11] Defendant Howard Sanders is the Chairman of the SDRHA Board. Doc. # 251-1 at ¶ 2. He served on the Board during the time period relevant to this suit. *Id*. at ¶5.

of SDRHA was substituted in the place of A.J. Jefferson in her official capacity as Executive Director of SDRHA.[12]  Doc. #78.

On June 13, 2014, Lloyd filed a motion for summary judgment and a motion for attorney fees.  Doc. #206, #208.  On September 12, the parties filed a barrage of motions, including: (1) a motion for summary judgment by SDRHA, Doc. #245; (2) a motion for summary judgment by Logan, Doc. #247; (3) a motion for summary judgment by Love, Doc. #249; (4) a motion for summary judgment by Sanders, Doc. #251; (5) a motion for summary judgment by Cordell, Doc. #253; (6) a motion for summary judgment by Gray, Doc. #255; (7) a motion for partial summary judgment by Relator, Doc. #257;[13] and (8) a motion to strike by Lloyd, Doc. #244.[14]

Through the relevant pleadings and briefing, it appears that Relator seeks to impose liability under the False Claims Act based on: (1) SDRHA's mixing[15] of federal and state funds; (2) Jefferson's role in the false invoice scheme; and (3) the "write-offs" of interfund balances.

---

[12] The order permitting substitution was issued by U.S. Magistrate Judge Jane M. Virden before the undersigned was assigned to the case.

[13] On December 31, 2014, the Court granted in part and denied in part Relator's motion for partial summary judgment.  Doc. #101.

[14] Additionally, Jefferson filed a document purporting to be a "joinder to the Motion for Summary Judgment and Memorandum brief in support of Motion for summary judgment filed by Defendants[ SDRHA], Howard Sanders, Robert Gray, Patricia Logan, Dennial Love and Larry Cordell …."  Doc. #267.  Even if this Court were inclined to let Jefferson join six separate motions for summary judgment without specifying which arguments apply to her case, her notice of joinder was filed after the September 12, 2014, dispositive motions deadline previously set in this case.  See Doc. #239.  Accordingly, this Court deems the purported joinder ineffective as untimely.  See Tarlton v. Exxon, 688 F.2d 973, 977 n.4 (5th Cir. 1982) ("[a] party may not belatedly join another litigant's motion ….").

[15] Relator uses the term "comingling" to refer to the placement of federal funds in an account containing non-federal funds.  See Doc. #276 at 4 (referring to "[m]ultiple instances of comingling of federal funds which clearly exceed the amounts necessary to fund the administrative portion of the federal side of South Delta's Operation."); see also Doc. #224 at 29 (stating that Jefferson "began comingling funds because she knew that in order to embezzle these federal funds she had to get them into an account over which she had check-writing authority").  Plaintiff's expert used a similar nomenclature.  See Doc. #281 at 6 ("The transfer of funds from accounts established to administer HUD funds to accounts established to administer non-HUD funds represents a co-mingling of funds.").  "As generally used, the term 'commingling of funds' refers to the use of one program's funds to pay expenditures for, and in excess of the funds available for, another program."  Doc. #245-5 at II-16.  This Court will follow the generally accepted nomenclature and refer to the placement of funds as "mixing" and the misuse of funds as "commingling."

Relator also brings retaliation claims against SDRHA and the individual defendants based on her termination and Jefferson's treatment of her prior to termination.

### III
### False Claims Act's Public Disclosure Bar

The purpose of the False Claims Act ("the Act" or "FCA") is "to provide for restitution to the government of money taken from it by fraud …." *U.S. v. Hess*, 317 U.S. 537, 551 (1943). Generally, a private individual "may bring a civil action for a violation [of the Act] for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). However, the Act prohibits a private citizen from bringing an action based on public disclosure of fraud, unless that citizen is an original source of the information. *See U.S. ex rel. Reagan v. E. Tex. Med. Center Reg. Healthcare Sys.*, 384 F.3d 168, 173–74 (5th Cir. 2004). The purpose of this "public disclosure bar" is "to accommodate the primary goals of the … Act: (1) promoting private citizen involvement in exposing fraud against the government and (2) preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *Id.* at 174 (internal quotation marks omitted).

Defendants argue that Relator's claims regarding the improper write-offs and the mixing of federal funds are foreclosed by the Act's public disclosure bar because the relevant transactions were disclosed by Buchanan's audits and Lloyd's financial reports.[16] Relator responds that the reports and audits do not qualify as public disclosures.

### A. Applicable Law

Until 2010, the Act provided:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or

---

[16] Although Defendants have filed separate motions for summary judgment, each motion raises this argument.

administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C.A. § 3730(e)(4) (West 2009) (internal footnote omitted)

In 2010, the relevant provision was amended to read:

(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
    (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
    (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
    (iii) from the news media,
unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C.A. § 3730(e)(4) (West 2014).

Courts have universally held that "the 2010 amendments to § 3730(e)(4) are not retroactive." *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc*, 764 F.3d 699, 706 (7th Cir. 2014); *see also U.S. ex rel. Boise v. Cephalon, Inc.*, No. 08-287, 2014 WL 5089717, at *6 (E.D. Pa. Oct. 9, 2014) ("[T]he Supreme Court has twice held that courts cannot apply the 2010 amendments to the public disclosure bar retroactively.") (citing *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Kirk*, 559 U.S. 280, 283 n.1 (2010), and *Schindler Elevator*

*Corp. v. U.S. ex rel. Kirk*, 131 S.Ct. 1885, 1889 n.1 (2011)). To this end, the Supreme Court has held that "the amendments are not applicable to pending cases." *Schindler*, 131 S.Ct. at 1889 n.1.

This action was filed on February 12, 2010, approximately a month before the effective date of the amendments. *See* Doc. #1. Accordingly, the Court will apply the Act's pre-amended version of the public disclosure provisions.

### B. Analysis

The burden rests on a relator "to prove that the allegations in his … claims were not based upon prior, public disclosures – or, if they were, that he was an original source of the information." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 728 (5th Cir. 2010). Before the 2010 amendments, the Fifth Circuit distilled the public disclosure "into a three-part test, asking 1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information." *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011). In the context of a summary judgment motion, the "defendants must first point to documents plausibly containing allegations or transactions on which [a] complaint is based. Then, to survive summary judgment, [the relator] must produce evidence sufficient to show that there is a genuine issue of material fact as to whether his action was based on those public disclosures." *Id*. As with all summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. *Id*.

Here, Defendants have identified three categories of allegedly public disclosures: (1) Lloyd's reporting to HUD of the interprogram balances; (2) Buchanan's annual audits; and (3) the LFA. *See* Doc. #207 at 23; Doc. #246 at 17.

The public disclosure of allegations or transactions requirement contains three sub-parts: "(1) public disclosure; (2) in a particular form specified in the statute; and (3) of allegations or transactions."  *U.S. ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 517 (N.D. Tex. 2012). As explained above, the burden at this stage of the inquiry rests upon a defendant to show that a public disclosure of allegations or transactions is plausible.  *McKesson*, 649 F.3d at 327; *see also Little v. Shell Exp. & Prod. Co.*, 690 F.3d 282, 292 (5th Cir. 2012) (citing *McKesson*, 649 F.3d at 327).

### 1. Public Disclosure

"[I]n order to be publicly disclosed, the allegations or transactions upon which a *qui tam* suit is based must have been made known to *the public* through some affirmative act of disclosure.  This requirement clearly contemplates that the information be in the public domain in some capacity and the Government is not the equivalent of the public domain."  *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004) (emphasis in original); *see also U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 54 (1st Cir. 2009) ("For the purpose of the FCA, public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain.").  Accordingly, neither disclosures to government officials nor government reports themselves may be deemed public disclosures, absent evidence such documents were released to the public at large.  *See U.S. v. Smith & Nephew, Inc.*, 749 F. Supp. 2d 773, 783 (W.D. Tenn. 2010) ("Unlike the Seventh Circuit, courts of appeals in other circuits have declined to hold that a defendant's disclosures to responsible government officials qualify as public disclosures capable of triggering the public disclosure bar.") (collecting authorities); *see also U.S. ex rel. Fine v. MK-Ferguson Co.*, 861 F. Supp. 1544,

1551 (D.N.M. 1994) ("The mere existence of a report, audit, or investigation containing information pertaining to fraud does not, in and of itself, constitute public disclosure.").

Here, there is no evidence that the LFA or Lloyd's reports to HUD were ever placed in the public domain. In the absence of such evidence, the public disclosure bar cannot apply regarding them.[17] *See U.S. ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 21 F. Supp. 2d 607, 615 (E.D. La. 1998) (declining to apply public disclosure bar in absence of evidence that relevant information was made public); *U.S. ex rel McCurdy v. Gen. Dynamics Nat. Steel & Shipbuilding (NASSCO)*, No. 07-cv-982, 2010 WL 3463675, at *2 (S.D. Cal. Aug. 31, 2010) (same).

In contrast, there is no dispute that the FY 2007 and FY 2008 Audits were submitted to this Court during the *Lowe* litigation and that such documents appeared on the civil docket. Because "[a]ny information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for purposes of section 3730(e)(4)(A)," this Court deems the two audits to have been publicly disclosed. *Fed. Recovery Servs., Inc. v. U.S.*, 72 F.3d 447, 450 (5th Cir. 1995).

### 2. Form

The statutory prescribed forms of disclosure are: "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media …." 31 U.S.C. § 3730(e)(4)(A) (2009). As

---

[17] Even if the LFA were a public document, it would not justify invocation of the jurisdictional bar. "Where a qui tam relator adds new claims based on a public disclosure to his amended complaint, that relator is nonetheless an original source under the FCA so long as the relator has averred in his original complaint the essential elements of the previously unknown scheme upon which the new allegations were based, and the alleged participants of that scheme." *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 519 F. Supp. 2d 7, 11–12 (D.D.C. 2007). Here, Relator's original complaint (filed well before the LFA) alleged that SDRHA's accountants concealed "the reporting of [Jefferson's] true financial dealings and other activities, as the executive director, with respect to the disposition of South Delta's State and Federal funds." Doc. #1.

mentioned above, the disclosure of the Buchanan audits occurred in a civil hearing. Accordingly, the second sub-part of the disclosure test has been met.

### 3. Transactions or Allegations

"[T]he key for determining whether allegations or transactions have been publicly disclosed is whether the critical elements of the fraudulent transaction were in the public domain." *Abbott Labs.*, 864 F. Supp. 2d at 519 (internal quotation marks omitted). In this regard, "[t]he critical elements have been sufficiently disclosed if the disclosures, taken together, would enable the government to draw an inference of fraud." *Id.* Put differently, "In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *Id.* (quoting *U.S. ex rel. Springfield Terminal Ry. V. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)) (emphasis in original, internal citations and quotation marks omitted). Fraud, in turn, "requires recognition of two elements: a misrepresented state of facts and a true state of facts." *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 842 (S.D. Tex. 2003) (quoting *Quinn*, 14 F.3d at 655) (internal quotation marks omitted). "[I]f both of those material facts have been previously disclosed, then enough information exists in the public domain to expose the fraudulent transaction." *Id.* (internal quotation marks omitted).

Relator contends, and this Court agrees, that the disclosures of the write-offs and mixing carried an implicit statement that the actions were proper. Accordingly, for the transactions to have been "disclosed" within the meaning of the public disclosure bar, the fact that the write-offs and mixing of funds were *improper* must "plausibly" have been in the public domain. *See Jamison*, 649 F.3d at 327.

25

First, as explained more fully below, the mixing of the funds was (and is) proper. It therefore follows that the impropriety of the mixing could not have been in the public domain. Accordingly, there is no jurisdictional bar to the consideration of the claims based on mixing.

Turning to the write-offs, Defendants have offered absolutely no argument or evidence which would suggest that the impropriety of the transactions disclosed by the FY 2007 and FY 2008 audits was in the public domain. Indeed, the fact that the provision of the audits directly to HUD did not lead to discovery of the wrongdoing suggests that the opposite is true. Drawing every reasonable inference in favor of Relator, the Court concludes that Defendants have failed to sustain their burden of showing that disclosure of the impropriety of the relevant write-offs was plausible. Accordingly, the public disclosure bar also does not prohibit this Court's consideration of the False Claims Act claims based on the allegedly improper write-offs. Having reached this conclusion, "the Court does not need to address whether Relator was an 'original source.'" *U.S. ex rel. Rose v. E. Tex. Med. Ctr. Reg. Healthcare Sys.*, No. 2:05-cv-216, 2007 WL 2350648, at *4 (E.D. Tex. Aug. 14, 2007); *see also U.S. ex rel. Holmes v. Consumer Ins. Grp.* 318 F.3d 1199, 1204 (10th Cir. 2003) ("Because we conclude that no 'public disclosure' occurred … we do not proceed to address the 'original source' question."). Thus, that portion of each Defendant's motion for summary judgment seeking a favorable ruling based on the application of the public disclosure bar will be denied.

## IV
## Claims Based on Mixing

"In determining whether liability attaches under the FCA, [the Fifth Circuit] asks: (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*,

689 F.3d 470, 475 (5th Cir. 2012) (internal quotation marks omitted). Throughout these proceedings, Relator has advanced the mixing of federal and state funds as both a theory of liability and a measure of damages. *See* Doc. #224 at 14; *see also* Doc. #276 at 4.

Defendants argue that the mixing of the funds may not support a claim for violation of the False Claims Act because the practice is expressly allowed by HUD.[18] In arguing that "the transfer of properly obtained federal funds from [SDRHA's] HUD account into its operating account" qualifies as a false claim, Relator cites to a HUD requirement prohibiting the improper *use* of HUD funds and requiring "separate accounting of HCV [funds] from public housing funds to avoid co-mingling or improper use of program funds." Doc. #276 at 7–8.

While there can be no doubt that "commingling" is impermissible, relevant HUD regulations provide that a housing authority "does not 'commingle' funds by pooling funds or by making expenditures for various programs from a single account used to pool funds." Doc. #245-5 at § II-16. The regulation clarifies that "[u]nless there is a specific legal requirement to maintain separate bank accounts for a specific purpose, the prohibition against 'commingling of funds' does not mean that the [housing authority] is required to physically segregate program funds in multiple bank accounts." *Id.*

Here, while Relator has cited to a HUD provision requiring separate *accounting* for HUD and non-HUD funds, she has failed to cite to a specific legal requirement requiring SDRHA to maintain its HUD and non-HUD funds in separate *accounts*. In the absence of such authority, the Court concludes that, to the extent Relator seeks to impose False Claims Act liability on Defendants for their role in mixing federal and state funds, such claims must fail because the mixing of the funds is neither a false statement nor a fraudulent course of conduct.

---

[18] All Defendants raise this argument in their respective summary judgment motions.

**V**
**SDRHA's Motion for Summary Judgment**

With regard to Relator's claims for violation of the False Claims Act, SDRHA identifies "three groups" of false claims identified by Relator, as derived from "Relator's Second Supplemental Responses to South Delta's second set of written discovery:" (1) "transfers of properly obtained federal funds from South Delta's HUD account to South Delta's general operating account, (2) payments made out of the general operating account to various contractors and employees, and (3) the interfund balance write offs." Doc. #246 at 13–14. SDRHA contends that summary judgment as to each category of claim is proper because: (1) "[t]he transfer of properly obtained federal funds from [SDRHA's] HUD account into its general operating account is not a false claim;" (2) "[p]ayments made by [SDHRA] to contractors and employees out of the general operating account are not per se false claims;" (3) "[t]his Court does not have subject matter jurisdiction over the interfund balance write off claims, but even if it does, they are not false claims;" (4) "[e]ven if the above transactions are considered 'false claims,' Relator must still prove that [SDHRA] knowingly submitted those false claims; (5) "Relator cannot prove that any of her alleged false claims resulted in any damage to the government;" and (6) Relator cannot prove that [SDHRA] conspired with anyone to submit a false claim." SDRHA also argues that Relator cannot state a claim under 18 U.S.C. § 1513(e), the anti-retaliation statute under which Jefferson was convicted; and that summary judgment is warranted against Relator on her retaliation claim brought under the False Claims Act. This Court has already concluded that the transfer of HUD funds to SDRHA's Business Account may not be considered a false claim. Accordingly, the Court turns to SDRHA's remaining arguments.

### A.   Payments by SDRHA to Contractors

31 U.S.C. § 3729(a)(1)(A) provides for liability against "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  This provision "requires proof only of the claim's falsity, not of its exact contents."  *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009).

As explained above, generally liability under the FCA attaches when: (1) there has been a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that involved a claim.  *Gonzalez*, 689 F.3d at 475; *see also U.S. v. Bollinger Shipyards, Inc.*, __ F. 3d __, 2014 WL 7335007, at *4 (5th Cir. Dec. 23, 2014); *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014).

### 1.   False Statements or Fraudulent Course of Conduct

A "false or fraudulent" claim is any claim "aimed at extracting money the government otherwise would not have paid."  *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, __ F. Supp. 2d __, 2014 WL 4230386, at *3 (S.D.N.Y. Aug. 7, 2014) (quoting *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001)).  Generally, this provision encompasses two types of conduct – legal falsity and factual falsity.  *Id.*; *see also U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010) (citing *Mikes*).

A claim is factually false "where the party submitting the claim supplies an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Kester*, 2014 WL 4230386 at *4 (internal quotation marks omitted).  A claim is legally false "only when a party affirmatively and explicitly certifies compliance with a statute or regulation and the certification is a condition to receiving the government benefit."  *Bennett*, 747

F. Supp. 2d 745 (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 889, 902 (5th Cir. 1997)).

"[A] plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." *Grubbs*, 565 F.3d at 190. Accordingly, if a relator "proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme – such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure – a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation."[19] *Id*. at 189–90.

Ample evidence, including her convictions for embezzlement,[20] creates a genuine issue of material fact as to whether Jefferson participated in two fraudulent billing schemes involving factually false statements: (1) a scheme related to submission of demands for payment on a fraudulent contract; and (2) a scheme related to submission of false invoices. These convictions also serve as sufficiently reliable indicia that false statements were made in connection with each scheme.[21]

In its reply, SDRHA argues that imputation of Jefferson's conduct to SDRHA is improper under the Fifth Circuit's decision in *U.S. v. Ridglea State Bank*, which held that under

---

[19] While *Grubbs* addressed False Claims Act pleading standards, the Court finds its discussion of inferences at trial applicable to the summary judgment inquiry.

[20] As explained in this Court's December 31, 2014, Order, Jefferson's convictions do not have preclusive effect against parties not in privity with Jefferson at the time of her criminal trial. Relator has not identified any basis on which this Court may find privity against any of the moving defendants. Accordingly, the convictions are not issue preclusive here. However, the convictions may still be admissible as non-conclusive evidence "to prove any fact essential to the judgment." See Fed R. Evid. 803(22) (allowing for admission of "[e]vidence of a final judgment of conviction").

[21] In its reply brief, SDRHA argues that Relator's "attempt to prove the contents of the alleged false claims without producing the actual claim violates the best evidence rule." Doc. #324 at 10. Because falsity may be proven without reference to the contents of a document, the Court overrules this objection.

the Act, "the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to the employer …." 357 F.2d 495, 500 (5th Cir. 1966). *Ridglea*, however, dealt with imputation of scienter, not conduct, to an employer. Unlike scienter, the conduct of an employee is attributable to an employer so as long as the relevant acts were "within the scope and in the course of his agency." *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 250 (1917); *see also U.S. v. Saks*, 964 F.2d 1514, 1525 (5th Cir. 1992) (citing *Hitchman*). Alternatively, a master may be subject to liability for the acts of his servant "if the act is committed outside the scope of employment [and the agent] was aided in accomplishing the tort by the existence of the agency relationship." *U.S. ex rel. Vavra v. Kellog Brown & Root, Inc.*, 727 F.3d 343, 349–50 (5th Cir. 2013).

In determining the scope of an agency relationship, a court should consider the following factors: "(1) the time, place and purpose of the act; (2) its similarity to acts which the servant is authorized to perform; (3) whether the act is commonly performed by such servants; (4) the extent of departure from normal methods; (5) the previous relations between the parties; and (6) whether the master would reasonably expect such an act would be performed." *Domar Ocean Tranp., Ltd., Div. of Lee-Vac, Ltd. v. Indep. Reining Co.*, 783 F.3d 1185, 1191 (5th Cir. 1986)

Considering the foregoing factors, the Court concludes that, notwithstanding Jefferson's selfish purpose, there is a genuine issue of material fact as to whether Jefferson's conduct fell within the scope of her employment as Executive Director. In reaching this conclusion, the Court draws the reasonable inferences that the conduct underlying the relevant schemes – submitting invoices and approving and causing payments on contracts – was performed while she was serving as Executive Director and was similar to conduct she was authorized to perform in her day-to-day control of the operations. *See Domar Ocean*, 783 F.2d at 1190–1191

31

(employee acted within the scope of employment when he stole cargo on his employer's boat). Accordingly, these fraudulent acts may be attributed to SDRHA and the first element of Relator's False Claims Act claim based on payments made out of SDRHA's general operating account has been met.

### 2.  Scienter

Relator argues that the requisite scienter for fraud may be imputed from either Jefferson or the members of the Board.  However, as explained above, *Ridglea* held that, under the False Claims Act, intent of an employee may not be attributed to an employer unless the employee acted with the purpose of benefiting the employer.  To this end, in *Ridglea*, the Fifth Circuit held that an employee does not act for his employer's benefit when he acts with a "purpose … to line his own pockets and those of his accomplices [and so] earlier wrongdoings would remain concealed."  357 F.2d at 498.

In the nearly fifty years since *Ridglea* was decided the opinion has been called into question by various courts.  *See U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 n.2 (D.D.C. 2003) (noting that 1986 "amendment to the FCA … obviated the concerns about attributing the heightened level of intent of an employee to an employer that had promoted the *Ridglea* decision"); *see also U.S. v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989) (referring to *Ridglea* as "not persuasive").  Indeed, the Fifth Circuit recently called into question the continued viability of the opinion.  *U.S. ex rel Vavra v. Kellog Brown & Root, Inc.*, 727 F.3d 343, 351 (5th Cir. 2013) ("[S]ince *Ridglea*, the Supreme Court has provided additional guidance in evaluating the elements required to assert vicarious liability under federal suit provisions.").  However, in the same opinion, the Fifth Circuit called *Ridglea*, "our court's precedent in FCA cases."  *Id.* at 352 n.12.  Thus, under binding Fifth Circuit precedent,

Jefferson's scienter (or the scienter of any SDRHA accomplice) may not be imputed to SDRHA unless she (or the accomplice) was acting for its benefit.

Here, even drawing every reasonable inference in favor of Relator, the Court cannot conclude that any of the participants of the scheme acted with any purpose other than to line their own pockets. Accordingly, neither Jefferson nor any SDRHA accomplice acted to benefit SDRHA and their scienter may not be imputed to the entity.

Relator also argues that the requisite intent may be imputed from the Board's lack of oversight of Jefferson. Relator points to the deposition of Cordell, a former Board member, in which Cordell testified that he could not recall the Board members undertaking any investigation into Jefferson's spending and that the Board members acted as Jefferson's "rubber stamp" with regard to her spending. Doc. #276 at 18.

The incorporation of recklessness into the False Claims Act's definition of knowing, was designed to ensure:

> persons who ignore "red flags" that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act. The definition, therefore, enables the Government not only to effectively prosecute those who have actual knowledge, but also those who play "ostrich".

House Report 99-660, 99th Cong., 2d Sess., to accompany False Claims Act of 1986 (June 26, 1996). Under this standard, "if a plaintiff can prove that a [entity's] structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274–75 (D.C. Cir. 2010).

In light of Cordell's testimony, the Court concludes that there is a genuine issue of material fact as to whether the Board members, who bore the responsibility for overseeing the

use of federal funds, deliberately chose to remain ignorant as to Jefferson's spending. This scienter, which is sufficient for liability under the Act, will be imputed to SDRHA.

### 3. Materiality

For a false or fraudulent statement to be material under the False Claims Act, it must "have the potential to influence the government's decisions." *Longhi*, F.3d at 470. As explained above, during the liability inquiry, a court looks to the falsity, not the contents, of a fraudulent statement.

As explained in more detail in this Court's December 31 Order, Doc. #101, Jefferson's conviction required that the jury conclude that federal funds were paid as a result of the relevant schemes. Under these circumstances, the Court finds that there is a genuine issue of material fact as to whether the falsity of the representations had the potential to influence the Government's decisions.

### 4. Existence of a Claim

The final element of Relator's false invoice cause of action requires that the fraudulent statement or conduct involved a claim. *Gonzalez*, 689 F.3d at 475. The Act defines a "claim," in relevant part, as:

> any request or remand … for money or property … that … is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government … provides or has provided any portion of the money or property requested or demanded…

31 U.S.C. § 3729(b)(2). As a general matter, "courts have found that the Government 'provides any portion' of the money requested when the Government has given even a drop of treasury money to the defrauded entity." *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 383 (5th Cir. 2014) (collecting cases).

Under section (a)(1) of the False Claims Act,[22] a "plaintiff must prove presentment [of a false claim] by a preponderance of the evidence." *Grubbs*, 565 F.3d at 189. SDRHA argues that "the mere fact that [SDRHA] paid someone out of its general operating account does not give rise to FCA liability for [SDHRA]. Instead, the FCA attaches liability to the person that submitted the false claim." Doc. #246 at 16. Moreover, SDRHA contends that the Act "requires Relator to prove every material element for each and every alleged false claim at issue."

In her response, Relator focuses on the facts underlying Jefferson's conviction – that is, that Jefferson was convicted for submitting false invoices – and Jefferson's deposition invocation of the Fifth Amendment with respect to the veracity of various specific invoices. Doc. #276 at 12. Relator also argues that SDRHA's argument "ignores the fact that HUD found as a fact that SDRHA's 'elimination' of the amounts owed to HUD constituted wrongful misuses of funds …." *Id*.

As an initial matter, the Court agrees with SDRHA's general statement that mere payment, standing alone, does not prove the existence of a false statement or fraudulent conduct as required for liability under the Act. Of course, Relator does not seek to prove fraud based on the payments alone.

### a. Count Four

As to the conduct in Count Four, the Superseding Indictment offered three classes of fraudulent transactions[23] which it claimed to be "all in violation of Title 18, United States Code, Section 641." *Criminal Case*, at Doc. #47-1, at 5. As framed, it is impossible for the Court to

---

[22] Although not specifically identified by Relator, it appears Relator brings the invoice payment claims under 31 U.S.C. § 3729(a)(1)(A).

[23] The Superseding Indictment identified: (1) personal purchases at Lowe's; (2) installation of a shower by Greenville Glass, and (3) construction work performed by Johnson Brothers Construction. *Criminal Case*, Doc. #47-1 at 5.

conclude which allegations were essential to the conviction. However, as explained in this Court's December 31 Order, the conviction under Count Four required a finding that Jefferson submitted at least one false invoice and that the invoice resulted in the payment of federal funds by SDRHA. *See* Doc. #342 at 7–8. Furthermore, the evidentiary record shows that SDRHA's HUD funds – the only federal funds identified by the record – are used to advance a Government program or interest. Based on these findings, the Court concludes that there is a genuine issue of material fact as to whether the conduct described in Count Four involved the submission of a claim, as that term is defined in the Act.[24] *See generally U.S. ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 808 (E.D. La. 2009) ("that the government allegedly made payment … necessarily presupposes the submission of a claim for payment").

In seeking to establish additional liability under the Count Four scheme, Relator, without citation or reference to specific transactions, argues that this requirement may be satisfied by Jefferson's repeated refusals to testify during deposition when asked about individual, specific invoices and transactions …." Doc. #276 at 12.

Jefferson's deposition is approximately 220 pages long, with the bulk of the pages representing questions about specific transactions, many of which fall well outside the scheme suggested by Count Four. It "is counsel's responsibility to point the court to relevant evidence within a deposition transcript." *Curl v. Compusa, Inc.*, No. 3:04-cv-529, 2005 WL 1595663, at *5 n.5 (S.D. Miss. July 5, 2005); *see also Magnum Towing & Recovery v. City of Toledo*, 287 Fed. App'x 442, 449 (6th Cir. 2008) ("It is not the district court's … duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its

---

[24] The Court notes that, insofar as Relator has not proven the actual contents of the claim, any recovery for this violation will likely be limited to the Act's civil penalty. *See Grubbs*, 565 F.3d at 190 ("exact dollar amounts fraudulently billed … will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty").

arguments before the Court."). The Court declines to sift through Jefferson's deposition to find potentially relevant transactions which may support SDRHA's liability. Accordingly, at most, the record reveals that Relator has created a genuine issue of material fact as to the submission of one false claim under the invoice scheme described in Count Four.

### b.   Count One

Count One of the Superseding Indictment charged that Jefferson caused SDRHA to issue checks pursuant to a fraudulent contract. To this end, Count One identified the dates and amounts of the checks and charged the demands and subsequent payment of federal funds as a single course of conduct.

The Act includes "demands … under a contract" as a type of claim. *See* 31 U.S.C. § 3729(b)(2)(A). The Court concludes that Jefferson's conviction for causing the creation of the checks creates a genuine issue of material fact as to whether she made a false demand for payment under the fraudulent contract. Likewise, for the reasons underlying this Court's discussion of Count Four, the Court further concludes that there is a genuine issue of material fact as to whether these demands under the contract were for funds provided by the Government for a Government purpose. Accordingly, whether the conduct described in Count One (fraudulently causing the drafting of two checks) involved a "claim" is an issue reserved for trial.

### c.   Summary

In sum, the Court concurs with SDRHA's contention that "the FCA attaches liability to the person or entity that submitted the false claim." Doc. #246 at 16. However, the conduct underlying Relator's claim is not the payment itself, but rather Jefferson's conduct, in her capacity as Executive Director of SDRHA, having caused the issuance of two fraudulent checks (as to her conviction under Count One) and the submission of false invoices (as to her conviction

under Court Four). Both of these acts are clearly demands for payment from SDRHA, which when paid upon, equate to a claim against a Government grantee receiving federal funds for a governmental purpose.

### 5. Damages

Any person found liable under the Act "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 1329(1). Damages under the Act "are limited to the amount that was paid out by reason of the false claim." *Longhi.*, 575 F.3d at 73. In ascertaining the proper amount of damages, "the Supreme Court will consider any reasonable method of calculating damages which will fairly reimburse the government for its losses and expenses, without creating a windfall for the government." *U.S. ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 885 (S.D. Ohio 1999) (citing *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994). However, before the government may recover treble damages, it must demonstrate the element of causation between the false statements and the loss." *Longhi,* 575 F.3d at 473.

With regard to damages, SDHRA argues in full that:

Here, all of the alleged false claims occurred after South Delta had properly received the federal funds from HUD. Relator's claims all relate to how money was used after receipt. As such, Relator cannot prove that the Government sustained any loss as a result of any of the alleged false claims.

Doc. #246 at 21. To the extent SDRHA argues that liability is foreclosed by SDRHA's possession of the relevant funds, this argument is summarily rejected, because the FCA expressly allows for liability in cases of fraud against grantees which *receive* federal funds.

Likewise, the Court rejects SDRHA's argument that its possession of government funds inoculated HUD from all loss. This novel theory rests on the erroneous assumption that HUD

lost all interest in the money transferred to SDRHA. To the contrary, the record shows that HUD maintained the right to re-possess all HUD funds in the event of non-compliance with the ACC. Thus, to the extent Jefferson's conduct resulted in the payment of HUD funds, it is clear that HUD suffered a loss.[25]

As explained in this Court's previous order, the payment of federal funds was necessary to Jefferson's convictions under Count One and Count Four. SDRHA has done nothing to rebut this evidence. Accordingly, the Court concludes there is a genuine issue of material fact as to whether the Government suffered damages as a result of the false invoice schemes.

### 6. Summary

SDRHA's motion for summary judgment will be granted in part and denied in part on the False Claims Act claims arising from Jefferson's allegedly having caused payments to be made on a false contract and false invoices. The motion will be denied as to whether Jefferson caused the issuance of the two checks described in Count One of Jefferson's superseding indictment and as to whether she submitted a single factually false invoice. The motion will be granted in all other respects.

### B. Interfund Write-Offs

SDRHA argues that the Court lacks jurisdiction over the write-off claims and that the write-offs are not "false claims" within the meaning of the False Claims Act. This Court has already rejected this argument of lack of jurisdiction over the write-off claims. Accordingly, the question becomes whether the write-offs may be considered false claims.

SDRHA argues that "HUD considered the interfund write offs to be a violation of the ACC and not a FCA violation." Doc. #246 at 20. SDRHA also argues that "[t]he write off is not

---

[25] For this reason, the Court rejects SDRHA's argument that Relator "is attempting to hold South Delta liable to itself." Doc. #325 at 5. Under the theory of Relator's case, SDRHA would not be liable to itself, but to the Government for SDRHA's role in causing the loss of funds in which the Government maintained an interest.

a 'request or demand for money or property' [and] did not result in HUD paying money to [SDRHA] that it did not owe." *Id.* at 19. But, SDRHA has cited no authority, and this Court has been unable to find any, which would support the proposition that a breach of a contract cannot also support a False Claims Act action. To the contrary, courts have held that "[e]ven though an express contract exists between the parties, the United States may plead, in the alternative … breach of contract … along with its claims under the False Claims Act." *U.S. v. United Techs. Corp.*, No. C-3-99-093, 2000 WL 988238, at *3 (S.D. Ohio Mar. 20, 2000) (citing *U.S. ex rel. Roby v. Boeing Co.*, 184 F.R.D. 107, 111 (S.D. Ohio 1998)). As to the SDRHA's second argument, Relator contends that the write-offs violated 31 U.S.C. § 3729(a)(1)(D) and 31 U.S.C. § 3729(a)(1)(G). Doc. #276 at 11.

First, Relator does not explain how or why the relevant write-offs come under the ambit of subsection (D). This failure to develop the relevant argument effectively represents a waiver of the point. *See U.S. v. Dominguez-Chavez*, 300 Fed. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or develop his due process and equal protection arguments in his appellate brief, and, thus, they are waived."); *see also El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.").

Second, 31 U.S.C. § 3729(a)(1)(G) provides for liability against any person who:

knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

Relator argues that "[t]he language contained in subsection G quoted above also applies to the acts of SDRHA in preparing the year-end audits for the years in which money that was clearly

40

owed to the government was simply 'eliminated.'  Each instance in which the money was simply written off, constituted a false claim under subsection G of the Act."  Doc. #276 at 11.

A claim brought under the Act's subsection (G), also known as the "reverse" claims section, has four elements:

> (1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result.

*Reagan*, 274 F. Supp. 2d at 840 (quoting *Wilkins ex rel. U.S. v. Ohio*, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995)).

### 1.  Record of Statement to Avoid an Obligation to the United States

Following a 1999 amendment to the Act, an obligation is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  Prior to this amendment, courts generally applied a stricter definition of "obligation" by holding that, under the reverse false claims provision, an obligation arose when a defendant "had a present duty to pay money … that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness." *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 735 (6th Cir. 1999); *see also U.S. v. Q Intern. Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) ("[A]n obligation under the meaning of the False Claims Act, must be for a fixed sum that is immediately due.").

As explained above, at the end of each fiscal year, SDRHA was obligated to credit to an administrative fee reserve the amount by "which program administrative fees paid by HUD for a PHA fiscal year exceed the PHA program administrative expenses for the fiscal year [plus i]nterest earned on the administrative fee reserve."  24 C.F.R. § 982.155.  This requirement

constitutes a present and fixed obligation to the United States under either formulation of the obligation inquiry. *See U.S. ex rel. Howard v. Urban Inv. Trust, Inc.*, No. 03-c-7668, 2007 WL 2893031, at *2 (N.D. Ill. Sep. 28, 2007) (relator stated claim under reverse false claims provision based on defendant's obligation "to return funds" to housing authority account).

It is undisputed that the audits submitted to HUD stated that no monies were owed to Government accounts. Insofar as the statements were contained in financial reporting documents intended to ensure the proper use of HUD funds, the Court concludes that there is a genuine issue of material fact as to whether the statements resulted in SDRHA avoiding its obligation to credit the funds to its administrative reserve.

### 2. Falsity

Based on the LFA's conclusion that the write-offs were inappropriate, the Court finds that there is a genuine issue of material fact as to the falsity of the audits' representations that no money was owed to government accounts.

### 3. Scienter

Relator argues that the requisite scienter to establish liability for the write-offs exists because "the testimony of Lloyd reflects that he and Buchanan knew that Jefferson was of the opinion that, 'Non-HUD NEVER owes HUD money' [and] that he knew that she was incorrect in that but he agreed to go along with the write-off anyway." Doc. #276 at 18–19.

With regard to accounting practices, a defendant "must manifest, at a minimum, an extreme version of ordinary negligence in the submission of false claims." *U.S. v. Mack*, No. H-98-1488, 2000 WL 33993336, at *5 (S.D. Tex. May 16, 2000) (citing *U.S. v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997)) (internal quotation marks omitted). The statute does not excuse defendants who claim the defense of confusion over billing practices or records, but also does

not punish those who make innocent mistakes." *Id.* at *5 (citing *UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 793 (Fed. Cl. 1999)).

In the present case, the record reflects that Lloyd, SDRHA's fee accountant, informed Buchanan that he disagreed with the practice of inter-fund write-offs, that write-offs were not a "common practice" and that it is "proper" to pay off the balances. Doc. #206-2 at 82–83. Under these circumstances, the Court concludes that there is a genuine issue of material fact as to whether Buchanan, acting on SDRHA's behalf, acted recklessly when he submitted the audits to HUD. For the same reasons, the Court concludes that there is a genuine issue of material fact as to whether Jefferson acted with the necessary scietner.[26]

### 4. Damages

As discussed above, SDRHA's sole argument with regard to damages relies on the erroneous assumption that the Government cannot be damaged by misappropriation of funds it pays to a grantee. This argument has already been rejected.

"Damages for a reverse false claim consist of the difference between what the defendant should have paid the government and what the defendant actually paid the government." *U.S. v. Bourseau*, 531 F.3d 1159, 1172 (9th Cir. 2008). There is no dispute that SDRHA failed to credit the excess administrative funds to an administrative reserve as required by the ACC and relevant regulations. Accordingly, there is a genuine issue of material fact as to the issue of damages.

---

[26] Drawing every reasonable inference in favor of Relator, the Court cannot conclude that Jefferson was not acting for SDRHA's benefit when she caused the misstatements in the audits, which had the effect of increasing the balance of SDRHA's general operating account. Accordingly, *Ridglea's* rule against imputing scienter does not apply to this claim.

### 5.  Summary

Insofar as Relator has established a genuine issue of material fact as to each element of a reverse false claim with regard to the write-offs, SDRHA's motion for summary judgment as to the write-offs will be denied.

### C.  Conspiracy

The False Claims Act provides for liability against any person who "conspires to commit a violation" of any of its subsections.  31 U.S.C. § 3729(a)(1)(C).  "To prove a conspiracy [a relator] must be able to show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by HUD and (2) at least one act performed in furtherance of that agreement."  *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008).  "As a part of that showing, [the relator] must demonstrate that defendants shared a specific intent to defraud the Government."  *Id.* (internal punctuation omitted).

SDRHA seeks summary judgment as to Relator's conspiracy claim on grounds that: (1) "Relator cannot prove that South Delta defrauded the Government" and (2) the intra-corporate conspiracy doctrine bars SDRHA agents and employees from conspiring between themselves. Doc. #246 at 22.

As to the first argument, this Court has found a genuine issue of material fact as to the existence of a violation of the False Claims Act.  However, even without an underlying violation, SDRHA's first argument would still be inappropriate because, a claim for conspiracy does not require an actual violation of the act – only an agreement to violate the FCA and an act in furtherance of the agreement.  *See Farmer*, 523 F.3d at 343.

"It is a general principle in conspiracy law that a conspiracy requires two or more persons or entities."  *Collins v. Bauer*, No. 3:11-CV-00887-B, 2012 WL 443010, at *7 (N.D. Tex. Jan.

23, 2012), *report and recommendation adopted*, No. 3:11-CV-00887-B, 2012 WL 444014 (N.D. Tex. Feb. 10, 2012) (citing *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914, (5th Cir. 1953.  Pursuant to this rule, a "corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hillard v. Gerguson*, 30 F.3d 649, 653 (5th Cir. 1994).  However, "[a]n exception to the rule exists in the rare instance in which employees have an independent personal stake in achieving the object of the conspiracy." *H&B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978).

Although unclear, it appears that Relator alleges a conspiracy between Jefferson and Johnson regarding the submission of the false invoices; and a conspiracy between the "separate legal entities" of Buchanan, Lloyd, and Jefferson, as to the write-offs. Doc. #276 at 21.

First, as explained above, under binding Fifth Circuit precedent, a relator in a False Claims Act action may not impute an employee's intent or knowledge to an employer when that employee is not acting to benefit the employer. *Ridglea*, 357 F.2d at 500.  Because Jefferson was not acting for the benefit of SDRHA when she submitted the false invoices, the specific intent necessary to support conspiracy liability may not be imputed to SDRHA. *Id.*

Second, Relator alleges a conspiracy between Jefferson, Lloyd (as SDRHA's fee accountant), and Buchanan (as SDRHA's auditor), surrounding the submission of financial information to HUD.  There can be no serious dispute that Buchanan and Lloyd acted as SDHRA's agents when they submitted financial information to HUD.[27] *See* Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the

---

[27] Relator seems to acknowledge Buchanan and Lloyd's status as agents of SDRHA by seeking to impute their scienter to SDRHA.  Doc. #276 at 18–19.

principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.").  However, even if the independent benefit exception to the intra-corporate conspiracy allowed for a conspiracy between Buchanan or Lloyd (as SDRHA's agents) and Jefferson (who arguably had an independent personal stake in covering up her embezzlement), Relator has pointed to no evidence which would support a shared *specific intent* to defraud the Government on the part of either Buchanan or Lloyd.  Thus, summary judgment will be granted in favor of SDRHA on the conspiracy claim.

### D.  Retaliation

SDHRA has moved for summary judgment on Relator's retaliation claims brought under the Act and under 18 U.S.C. § 1513(e) of the Criminal Code.  Relator concedes that summary judgment is appropriate as to the claim brought under § 1513(e).  Doc. #276 at 22.

Under the False Claims Act's anti-retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  There are three elements to a claim of retaliation under the Act: "(1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity."  *U.S. ex rel George v. Boston Scientific Corp.*, 864 F.Supp.2d 597, 604 (S.D. Tex. 2012) (collecting cases) (internal quotation marks omitted).  Although once again less than clear, it appears that Relator argues that SDRHA retaliated against her by: (1) terminating her employment; and (2) creating a hostile work environment.  Doc. #276

46

at 32.  SDRHA argues that these claims fail each element of a False Claims Act retaliation claim.
Doc. #246 at 24–28.

### 1.  Protected Activity

"A protected activity is one motivated by a concern regarding fraud against the
government."  *McCollum v. Jacobs Eng'g Group, Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss.
2014) (quoting *Thomas v. ITT Educ. Servs., Inc.*, 517 Fed. App'x 259, 262 (5th Cir. 2013)).  "To
engage in protected activity under the Act, an employee need not have filed a lawsuit or have
developed a winning claim at the time of the alleged retaliation.  Instead, an employee's actions
must be aimed at matters that reasonably could lead to a viable claim under the Act."  *Boston
Scientific*, 864 F.Supp.2d at 604–05 (internal citations omitted) (collecting cases).  Stated another
way, the actions must relate to "matters demonstrating a 'distinct possibility' of False Claims Act
litigation."  *Id*. at 605.  This standard is satisfied when "(1) the employee in good faith believes,
and (2) a reasonable employee in the same or similar circumstances might believe, that the
employer is committing fraud against the government."  *Id.*

SDRHA, citing to *Dookeran v. Mercy Hospital of Pittsburgh*, 281 F.3d 105 (3d Cir.
2002), argues that Relator could not have engaged in protected activity because neither the
elimination of interfund balances nor the mixing of funds may be considered "false claims"
under the FCA.  Doc. #246 at 25.  In *Dookeran*, the Third Circuit held that because the activities
a relator complained of were not claims within the meaning of the Act, "there was no possibility
that [the relator] could have filed a viable FCA action.  Thus, his activity could not have been
taken in furtherance of an FCA action, as is required to constitute 'protected activity ....'"  281
F.3d at 109.

Here, evidence shows that Relator served as an FBI informant for an investigation into, among other things, a false invoice/billing scheme perpetuated by the Executive Director of SDRHA against SDRHA. It is beyond dispute that three of SDRHA's four operating accounts, including its "primary" operating account, contained federal funds. Drawing every reasonable inference in favor of Relator, the Court concludes that there is a genuine issue of material fact as to whether knowledge of misappropriation of SDRHA funds created a reasonable belief of fraud against the Government. *Shupe*, 759 F.3d at 383 (recognizing that False Claims Act liability attaches where "Government has given even a drop of treasury money to the defrauded entity"). Accordingly, Relator's participation in the FBI investigation, which was aimed at stopping the misappropriation of such funds, falls squarely within the Fifth Circuit's definition of a protected activity as an act "motivated by a concern regarding fraud against the government."[28] *Thomas*, 517 Fed. App'x at 262.

### 2. Knowledge

The "kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that Plaintiff is engaged in protected activity as defined [in the first element] – that is, in activity that reasonably could lead to a False Claims Act case." *U.S. ex rel. Yesudian v. Howard Univ*. 153 F.3d 731, 742 (D.C. Cir. 1998). At the second stage, it is sufficient to show knowledge of a supervisor. *See U.S. v. Columbia*

---

[28] In reaching this conclusion, the Court rejects SDRHA's argument that "Relator's actions cannot be considered protected activity under the FCA because of one undeniable fact: South Delta committed no fraud." Doc. #246 at 24 (emphasis in original). First, as explained above, there is a genuine issue of material fact as to whether SDRHA may be held liable for the relevant fraud. Even if this were not true, SDRHA has cited no authority, and the Court has been unable to find any, which would support the proposition that an employer can retaliate against an employee for that employee's participation in investigation into fraud against the government so long as the employer would not be liable for the relevant fraud. It is undisputed that Relator participated in an FBI investigation into fraud involving SDRHA's federal funds. This activity is protected under the Act.

*Healthcare Corp.*, No. H-98-861, 2005 WL 1924187, at *17 (S.D. Tex. Aug. 10, 2005) (citing *Yesudian*).

Relator argues that SDRHA obtained the requisite knowledge from two sources: (1) the June 21, 2010, letter from Norman to Kitchens; and (2) a series of FBI interviews with Board members during which the Board members were told of the possible misappropriation of funds. Doc. #276 at 26–27. SDRHA does not deny that it had knowledge of Relator's role in the investigation of misappropriation of SDRHA funds. Rather, SDRHA contends that notice of "'mishandling and misappropriating *South Delta Region [sic] Housing Authority funds*,' does not satisfy the notice requirement for FCA retaliation." Doc. #246 at 28 (emphasis in original). The Court disagrees because, as explained above, there is a genuine issue of material fact as to whether knowledge of possible misappropriation of SDRHA funds created a reasonable belief of fraud against the Government.

### 3. Causation

Plaintiffs bringing retaliation claims under the FCA must establish that retaliation for plaintiffs' protected activity was the but-for cause of the adverse employment action. *U.S. ex rel. Schweizer v. Ocè N. Am., Inc.*, 956 F. Supp. 2d 1, 13–14 (D.D.C. 2013). In seeking to establish causation, Relator relies on "evidence of direct retaliation." Doc. #276 at 23.

#### a. Termination

In seeking to establish causation as to her termination, Relator cites two pieces of evidence: (1) Jefferson's conviction under Count Seven of the superseding indictment, which charged Jefferson with, among other things "using the board of directors [of] SDRHA to suspend and then terminate [Relator's] employment;" and (2) Cordell's testimony that the Board acted as a rubber stamp with regard to Jefferson's spending. Doc. #276 at 29–30.

First, as explained in this Court's previous order, Jefferson's conviction is not issue preclusive as to claims brought against SDRHA. Furthermore, to the extent Count Seven charged an array of retaliatory conduct in addition to the termination, the Court cannot deem the conviction of evidentiary value as to the motivation for Relator's termination. Finally, Cordell's testimony regarding the Board's treatment of Jefferson's spending has no bearing on Relator's termination. In short, Relator has failed to create a genuine issue of material fact as to whether her protected activity was a but-for cause of her termination.

### b. Harassment

"The 'whistleblower' provision of the False Claims Act prevents the harassment … of employees who assist in or bring qui tam actions." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 950 (5th Cir. 1994). Relator has introduced evidence showing that Jefferson: (1) removed Relator's job responsibilities and duties; (2) barred Relator from entering the accounts receivable room; (3) assigned Relator impossible tasks; (4) lied about Relator's accomplishments; and (5) demoted Relator. Doc. #295 at 2–3; Doc. #294 at 2–3; Doc. #245-18 at 91.

While Jefferson's conviction cannot create a genuine issue of material fact as to the cause of her termination, the Court deems it direct evidence that Jefferson possessed a retaliatory animus with regard to Relator's participation in the FBI investigation. Based on this retaliatory animus, the Court concludes there is a genuine issue of material fact as to whether the harassment of Relator by Jefferson was caused by Relator's participation in the FBI investigation. *See Rispoli v. King Cnty.*, No. 2:04-cv-1500, 2005 WL 2898137, at *3 n.3 (W.D. Wash. Nov. 3, 2005) ("A reasonable jury could infer causation from plaintiff's direct evidence of

retaliatory animus on the part of one or more of the persons responsible for the adverse employment actions.").

Without citation, SDRHA argues "South Delta would only be vicariously liable for acts that were taken within the course and scope of Jefferson's employment …" Doc. #325 at 17. However, an employer may be liable for a supervisor's harassing conduct where the conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harvill v. Westward Comms., L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (internal punctuation omitted). In considering whether conduct is severe or pervasive, a court should consider the "totality of the circumstances, including the frequency of the discriminatory conduct; its severity; wither it is physically threatening or humiliating … and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted).

Jefferson's conduct, which included barring Relator (who worked in accounting) from the accounts receivable room, was aimed primarily at disrupting Relator's ability to work. Accordingly, the Court concludes there is a genuine issue of material fact as to whether the harassment was sufficiently severe or pervasive to warrant the imposition of vicarious liability against SDRHA. Thus, summary judgment on the retaliatory harassment claim will be denied.

### 4. Summary

SDRHA's motion for summary judgment on the retaliation claims will be granted in part and denied in part. The motion will be granted with respect to the retaliation claim brought under 18 U.S.C. § 1513(e) and to the retaliatory termination claim brought under the False Claims Act. The motion will be denied as to the claim for retaliatory harassment brought under 31 U.S.C. § 3730.

**VI**
**Lloyd's Motions**

Lloyd has filed a motion for summary judgment, a motion for attorney's fees, and a motion to strike.

### A.  Motion for Summary Judgment and Motion for Attorney's Fees

Lloyd's motion for summary judgment raised two arguments: (1) that the Court lacks jurisdiction over the commingling and write-off claims; and (2) the commingling claim fails because the mixing of federal and state funds is proper.  The Court has addressed each of these arguments.  Accordingly, Lloyd's motion will be denied as to jurisdiction and granted as to the merits of the commingling claim.  Having reached this conclusion, the Court will deny Lloyd's motion for attorney's fees.

### B.  Motion to Strike

In support of her claims, Relator has submitted a Supplemental Report of Edward W. Sauls.[29]  Doc. #244-2.  In his report, Sauls, a Certified Public Accountant with more than forty years of experience, provides opinions regarding, among other things, "the transfers of funds by SDRHA from HUD … accounts to non-HUD accounts."  *Id*. at 2.  With regard to such, Sauls "summarized" a report conducted by Kathy Howell of the HUD OIG.  Doc. #244-2 at 6.  From this summary, Sauls aggregated the "funds transferred from accounts established to administer HUD funds to other accounts …."  *Id*. Sauls then opined that "[t]he co-mingling of Federal and non-Federal funds perpetuates an environment which allows for systemic fraud."  *Id*. at 7.  Lloyd has moved to strike the Sauls opinion regarding the interfund transfers as unreliable expert testimony on the grounds that "Sauls' damage calculation is premised on [a] wrong accounting theory."  Doc. #244 at 5.

---

[29] Sauls issued a supplemental report to include updated data.  *See* Doc. #244-2 at 2.

Relator responds that Sauls is not opining on the proper method for measuring damages. Doc. #317 at 7. Rather, Relator contends that Sauls "is just being asked to follow … the money" and that "[t]he real question being asked in this instance is how does one measure damages in a False Claims Act … case involving HUD…." Doc. #317 at 6.

### 1. Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence allows opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education," but only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the United States Supreme Court "assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is not only relevant, but reliable." *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007) (internal quotation marks omitted). Commensurate with this duty, a trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. To this end, the proponent of the expert testimony "need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson v. Arkema, Inc*, 685 F.3d 452, 459 (5th Cir. 2012).

When considering reliability, *Daubert* dictates that trial courts should consider "the extent to which a given technique can be tested, whether the technique is subject to peer review

and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community." *Hathaway*, 507 F.3d at 318. The *Daubert* factors "are not mandatory or exclusive." *Id*. Rather, the district court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id*. (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

### 2. Analysis

In analyzing the motion to strike, it is important to distinguish between the contents of the Sauls opinion and the manner in which Relator seeks to use the opinion. Nowhere in his opinion does Sauls opine that the proper measure for damages in this case is the aggregate of HUD to non-HUD transfers. Rather, Relator seeks to use the aggregate of transfers derived by Sauls to prove damages. The question then is not whether Sauls aggregated the transfers properly (there can be no serious dispute that he did), but rather whether the aggregation would help the trier of fact determine a fact at issue—namely, Relator's damages if liability is proven. In this regard, Relator argues that:

> in False Claims Act cases in which the recipient is a third party … the courts have consistently held that the measure of damages is restitution or disgorgement. *See[] United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) …. In [this] case … the recipient of the contractor's (SDRHA) benefits is not the government (HUD), but is instead, the low-income housing tenant. Thus the measure of damages is … disgorgement [or] restitution. In this instance, the measure of disgorgement or restitution is the amount of federal funds that were commingled.

Doc. #317 at 5–6.

Damages under the False Claims Act "are limited to the amount that was paid out by reason of the false claim." *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 473 (5th Cir. 2009).

*Rogan*, the case cited by Relator, provides a perfect example of this formulation. In *Rogan*, a healthcare provider provided healthcare to certain individuals eligible for certain conditional subsidies. 517 F.3d at 453. It was undisputed that the defendant failed to satisfy the relevant conditions and that "[w]hen the conditions [were] not satisfied, nothing [was] due." *Id*. Accordingly, the Seventh Circuit concluded that "the entire amount that [the defendant] received … must be paid back." *Id*.

Here, Relator has offered no evidence or argument that the Government paid out any funds as a result of the interfund transfers. More importantly, as explained above, the interfund transfers are not false claims. Accordingly, the Court rejects Relator's argument that Sauls' aggregation would be helpful to determining the issue of damages in this action. Thus, the motion to strike the section of Saul's opinion dealing with interfund transfers will be granted.

**VII**
**Individual Defendants' Motions for Summary Judgment**

Logan, Love, Sanders, Cordell, and Gray have moved for summary judgment in their individual capacities, arguing that there is no evidence any of them violated the False Claims Act. More specifically, each of these individual defendants argues that there is no evidence that any of them conspired to commit a false claim, knowingly submitted a false claim, or knowingly caused a false claim to be submitted. They also seek summary judgment on the retaliation claims.

In her response, Relator argues that liability may be found against: (1) Logan and Love because they "possessed actual knowledge of the Fraud and of the acts of retaliation against Relator," Doc. #318 at 3; and (2) Sanders, Cordell, and Gray, ("the Board Members") because, as Board Members, they "pass[ed] a new set of operating procedures greatly expanding

55

[Jefferson']s authority and removing many of the built-in controls and failed to exercise sufficient oversight over Jefferson, Doc. #303 at 6.

### A. Retaliation

As explained in this Court's previous order, §1513(e) does not provide for a private cause of action. Furthermore, the False Claims Act's anti-retaliation provision does not allow for individual liability. Accordingly, summary judgment in favor of the individual defendants on the retaliation claims will be granted.

### B. Conspiracy

Relator has offered no argument or evidence showing that any of the individual defendants possessed a shared specific intent to defraud the Government. Accordingly, summary judgment in favor of the individual defendants on the conspiracy claims will be granted.

### C. Logan and Love

The False Claims Act requires that a defendant knowingly presents or "causes" to be presented, a false claim. *See* 31 U.S.C. § 3729(a). The causation standard employs traditional notions of proximate causation "to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim …." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006). Proximate cause is one of "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992). Under federal law an act will be deemed a proximate cause of a result if the act is a "substantial factor in the sequence of responsible causation, and if the [result] is reasonably foreseeable or anticipated as a natural consequence." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir. 1990).

In a False Claims Act action, to establish causation a relator must show an "affirmative act" going beyond "mere passive acquiescence." *Regence*, 472 F.3d at 714–15. This requirement "strikes the appropriate balance between shielding from liability parties who merely fail to prevent the fraudulent acts of others, and ensuring that liability attaches for 'affirmative acts' that do cause or assist the presentation of a fraudulent claim." *Id*. at 715.

Based on her response, it is clear that Relator seeks to impose liability on Logan and Love for nothing more than mere passive acquiescence. Accordingly, summary judgment in favor of Logan and Love on the False Claims Act claims will be granted.

### D. Cordell, Gray, and Sanders

Relator does not argue that the Board Members actually submitted any false claims. Rather, Relator contends that the Board Members caused Jefferson's submission of false claims. As explained above, Relator has proven the submission of false claims arising from Jefferson's invoice scheme and the submission of the audits.

"To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." *U.S. v. President and Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 186–87 (D. Mass. 2004). In this regard, "actually delegating the submission of claims to one who then files a false claim suffices." *Id*.

The evidence shows that the Board was tasked with oversight of federal funds and largely delegated responsibility regarding federal spending to Jefferson. This delegation is sufficient to establish causation under the Act. Accordingly, the question becomes whether the Board members knowingly caused the submission of the false claims established by the evidence (the false invoices and the erroneous audits).

In seeking to impose liability on the Board Members, Relator cites the following as evidence of knowledge or recklessness: (1) the firing of the previous accounting team and the hiring of Buchanan and Lloyd;[30] (2) the Board's passage of a new set of operating procedures which increased Jefferson's check writing authority from $10,000 to $200,000; (3) the Board members' general practice of acting as a "rubber stamp" as to Jefferson's spending; (4) Gray's admission that when he arrived the procedures at SDRHA were not designed to prevent fraud; (5) Gray did not know the specifics of SDRHA's procurement policy; (6) the Board's hiring of a law firm to defend Jefferson; (7) various statements made by Cordell and Sanders during FBI interviews in which they stated they were not aware of certain details of SDRHA's operations; and (8) Jefferson invoking the Fifth Amendment when asked whether a Board member ever questioned her regarding her spending.[31]  *See* Doc. #303.

As explained above, the Act's recklessness standard is designed to incorporate two types of conduct: (1) ignoring red flags; and (2) willful ignorance as to the relevant claims procedure. *See U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, No. 01-cv-4078, 2005 WL 3542471, at *9 (D.N.J. Dec. 23, 2005).  Relator has pointed to no evidence which would suggest that any of the Board members ignored red flags or remained deliberately ignorant as to the process surrounding submission of yearly financials to HUD.  Accordingly, summary judgment in favor of the Board members will be granted against Relator's claims based on the submission of the audits.

---

[30] Relator does not argue that the Board actually approved either the firing of SDRHA's previous accounting team or the hiring of Buchanan or Lloyd.  Rather, she speculates that "perhaps" these acts were approved by the Board.  This type of conjecture is of no evidentiary value.  *See Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.2011) ("[S]peculation, and unsupported assertions are insufficient to avoid summary judgment.")

[31] Citing to notes from an FBI interview, Relator's brief also makes a reference to Cordell being unaware "that he had voted to give the Executive Director authority to modify contracts without commissioner approval."  Doc. #303 at 13.  Relator does not cite any evidence that Cordell made such a vote or that the measure passed.

In contrast, the Court concludes that the Board Members' act of rubber stamping Jefferson's spending evidences a sufficient level of deliberate ignorance to create a genuine issue of material fact as to whether the members acted with the requisite level of recklessness to impose liability for the false invoice scheme. Accordingly, summary judgment in this regard will be denied.

### E. Summary

Logan and Love's motions for summary judgment will be granted. The motions for summary judgment of Cordell, Gray, and Sanders, will be granted in part and denied in part. The motions will be denied as to the claims arising from Jefferson's submission of false invoices. The motions will be granted in all other respects.

### VIII
### Conclusion

For the reasons above: (1) Lloyd's motion for summary judgment [206] is **GRANTED in Part and DENIED in Part**; (2) Lloyd's motion for attorney's fees [208] is **DENIED**; (3) SDRHA's motion for summary judgment [245] is **GRANTED in Part and DENIED in Part**; (4) Logan's motion for summary judgment [247] is **GRANTED**; (5) Love's motion for summary judgment [249] is **GRANTED**; (6) Sanders' motion for summary judgment [251] is **GRANTED in Part and DENIED in Part**; (7) Cordell's motion for summary judgment [253] is **GRANTED in Part and DENIED in Part**; (8) Gray's motion for summary judgment [255] is **GRANTED in Part and DENIED in Part**; and (9) Lloyd's motion to strike [244] is **GRANTED.**


SO ORDERED, this the 16th day of January, 2015.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

59